ELIZABETH GARMONG *vs.* JOHN B. HENDERSON.

Penobscot. Opinion November 27, 1916.

*Breach of contract to marry. Burden of proof when defendant's pleading raises the issue of chastity of the plaintiff. Burden of proof when case is reported to Law Court. Jury powers of Law Court in determining liability when case is sent on report.*

This is an action for breach of promise of marriage. A former verdict for the plaintiff has been set aside as against the evidence. The case now comes before this court on report, for the determination of the liability of the defendant, the jury having passed upon the question of damages under a stipulation of the parties.

Held;

1. The burden now rests more heavily upon the plaintiff than when the case came to this court before, with a verdict of the jury in her favor.

2. Then the burden was upon the defendant to convince the court that the verdict was manifestly wrong. Now the court is acting with jury powers, the question of the preponderance of evidence is open and the burden is upon the plaintiff to substantiate her claim.

3. If upon the former evidence, plus a verdict, the plaintiff was not allowed to recover, she cannot now prevail, minus a verdict, unless her case has been strengthened by additional and effective testimony to such an extent that she can now sustain the burden of proof.

4. The new evidence offered by the plaintiff is meagre and unimportant, while that presented by the defendant materially strengthens the defense.

5. The existence of a mutual engagement of marriage can be proved either by direct evidence of an express promise or by evidence of such facts, conduct and circumstances as will lead to a reasonable inference of such engagement and contract.

6. The evidence here is insufficient to prove either. The proof of an express promise comes wholly from the plaintiff and in view of the fact that she swore falsely either in the courts of Iowa where she instituted proceedings against one Smith, or in the courts of Maine where she makes similar charges against the defendant, little weight can be attached to her statements.

7. Nor can any promise or agreement be reasonably inferred from the conduct of the parties viewed in the light of all the circumstances. The contrary inference is the more probable and reasonable.

8. It is a settled principle of law that if the plaintiff was unchaste with other men or with another man prior to or during an engagement with the defendant, it is a bar to this suit, unless at the time he made or renewed his promise he knew or had been informed of her unchastity.

9. Even assuming that an engagement was entered into in August, 1909, or in 1910, or at any time prior to November, 1910, when the plaintiff gave birth to a child, she has failed to convince the court upon these two essential points.

10. A promise of marriage made by the defendant in November, 1910, in view of all the facts and circumstances is unbelievable. Her own conduct in first instituting bastardy proceedings against him negatives the idea of such a promise and reveals her own belief as to the true relations existing between the parties.

11. The question now before this court is not the paternity of the child, but the existence of a valid promise of marriage, and upon that question it is the opinion of the court that the plaintiff has failed to substantiate her claim.

Action of assumpsit to recover damages for an alleged breach of contract to marry the plaintiff. Defendant filed a plea of general issue and also brief statement. The jury were allowed to assess the damages, and case was reported to Law Court upon certain stipulations which are set forth in the opinion. Judgment for defendant.

Case stated in opinion.

*John B. Merrill, and Creed M. Fulton,* for plaintiff.

*Fellows & Fellows, and Deasy & Lynam,* for defendant.

SITTING: SAVAGE, C. J., CORNISH, KING, HALEY, PHILBROOK, JJ.

CORNISH, J. The plaintiff in this action seeks to recover damages for an alleged breach of promise of marriage. The ad damnum is $250,000. The writ alleges that a contract was entered into between the parties about March 10, 1910, in the city of Washington, D. C., the marriage to take place sometime during that year; that on November 6, 1910, the promise was renewed by the defendant but the date was deferred to about March 1, 1911, and that the defendant subsequently refused to be bound by his promise and repudiated the agreement.

The defendant in his pleadings denies the existence of any contract and by way of brief statement sets up as a bar the unchastity of the plaintiff prior to the date of the first alleged promise and between that date and the date of the second alleged promise, the latter being shown by proceedings instituted by her in Iowa against one Roscoe D. Smith for seduction under promise of marriage. He further pleads his ignorance of these facts until after the date of the second alleged promise.

Upon the issues joined, the cause was tried at the January term, 1915, for Penobscot county, and a verdict was rendered in favor of the plaintiff in the sum of one hundred and sixteen thousand dollars. This verdict was set aside by the Law Court. The concluding language of the opinion is this: "We do not say that there is no evidence to sustain the verdict in this case, for the plaintiff has testified. But we do say upon the whole record, giving to the plaintiff such degree of credibility as her own statements entitle her to, her practically unsupported testimony is so overborne by proved circumstances, by her obvious disregard either here or in Iowa of the sanctity of an oath, by her own inconsistent conduct, by the mutual conduct of both, by the testimony, contradictory to hers, of witnesses apparently reputable, disinterested and credible, and by the probabilities of the case inconsistent with her claims, as to induce the belief that the jury either did not sufficiently weigh all of the facts of the case or were influenced by sympathy, passion or prejudice." *Garmong* v. *Henderson,* 114 Maine, 75, 90.

A second trial was had at the April term, 1916, when the jury assessed the damages in the sum of seventy-five thousand dollars, and the case was reported to the Law Court upon so much of the evidence as is legally admissible, the Law Court to determine the liability of the defendant and if liability is established to enter judgment upon the amount of the verdict, unless the defendant should file a motion for a new trial because of excessive damages. In that event the Law Court is to reduce the damages, if found excessive, to a sum which would be the greatest amount that it would approve if found by the jury. That motion has been filed.

Under this stipulation this court acts with jury powers in determining in the first instance the liability or non liability of the defendant. The burden therefore rests more heavily upon the plaintiff now than when the case came to this court before with a verdict of a jury in her favor. That verdict threw upon the defendant the burden of proving to the satisfaction of the court that it was manifestly wrong, and the well settled rule is that where the evidence is conflicting "a verdict will not be disturbed if it is found to be supported by evidence, credible, reasonable and consistent with the circumstances and probabilities of the case, so as to afford a fair presumption of its truth, even though it may seem to the court that the evidence as a whole preponderates against the finding of the jury." *Garmong* v. *Henderson,* supra. Notwithstanding this rule, which gives so much weight to the findings of a jury, and which was not only recognized but expressly stated in the opinion, this court had no hesitation in determining upon all the evidence and circumstances that the jury had clearly erred in finding a verdict in the plaintiff's favor; in other words that the plaintiff had so obviously failed to make out a legal and enforceable cause of action that even with the aid of a verdict she could not be allowed to prevail.

The present situation is different. As the case is now before us on report, the burden is on the plaintiff to prove her case, and the question of the preponderance of evidence is open. If upon the former evidence plus a verdict she was not allowed to recover, upon substantially the same evidence minus a verdict she certainly cannot prevail. By agreement the evidence at the former trial, as well as at this, is before us, and the crucial test therefore is, whether the plaintiff has strengthened her case by additional and effective testimony to such an extent that she can now sustain the burden of proof and maintain her action.

A patient study of the entire evidence compels us to answer this question in the negative.

In the former opinion the facts and circumstances were exhaustively discussed. Every phase of the case as raised by the pleadings or developed by the voluminous evidence was carefully considered. The evidence now before us is doubly voluminous

because the testimony at the first trial was for the most part repeated at the second, and we now have a record consisting of two volumes of about five hundred pages each instead of one. In view of the previous thorough analysis it would be a needless task to again dissect the same evidence.  It is sufficient for our purpose to fashion the barest outline of the salient events and then consider the bearing and effect of the new evidence upon the vital issues in the case.

The plaintiff was born in Iowa in 1880.  While at school there she became engaged to one Roscoe D. Smith.  In November, 1907, she came to Baltimore to pursue her medical studies and was a special student at the Woman's Medical College from November, 1907, to May, 1908, when she was requested by the faculty to withdraw because of her unsatisfactory work.  She may have attended some other medical lectures in Baltimore for a short time, and then she engaged in nursing.  She first met the defendant casually in June or July, 1909, at a residence in Washington where she was visiting.  He took her on a short automobile drive at that first meeting and they were together for an hour or two.  Soon after, the defendant went to his summer home in Bar Harbor. The plaintiff followed, at some time in July without informing him that she was coming.  She was a stranger in the place, and stopped at a boarding house.  She remained in Bar Harbor about four weeks and during that time they walked and rode and sailed together on several occasions.  At her departure she borrowed seventy-five dollars of him to pay her expenses west.  She went first to her uncle's in Scranton, Pennsylvania, and then to Philadelphia where she resumed her occupation as a nurse.  She remained in Philadelphia until February, 1910.  The defendant visited her once while she was there, they taking dinner together at a hotel, and she went to Washington to meet him five or six times, their meetings there also taking place at a local hotel.  On these trips the defendant paid her traveling expenses.  In February, 1910, she left Philadelphia and went to Washington, boarding for a time with her aunt.  The parties met as before, taking automobile rides together and dining together at one or more hotels.  He never visited her at her aunt's house, but on one or more occasions took

her from there before or brought her back there after their rides. Nor did he take her to his own home nor introduce her to his family. About the first of April, 1910, the plaintiff left Washington and went to her home in Des Moines, Iowa. Visits from her lover, Roscoe D. Smith, were soon resumed. On July 6, 1910, she instituted a criminal proceeding against Smith, alleging under oath that on or about June 15, 1910, and July 4, 1910, he had seduced her under promise of marriage. Smith was arrested and incarcerated, but the case was not prosecuted and he was released. She then began a civil suit against Smith for breach of promise of marriage, with an allegation of seduction. Smith attempted to adjust this suit and a settlement was agreed upon, but the plaintiff refused to sign a receipt and discharge. In September, 1910, the plaintiff secured an indictment for seduction against Smith, she testifying under oath before the Grand Jury that she had been engaged to him, that because of their engagement she had submitted to his embraces and had had sexual intercourse with him soon after April first, 1910, and was then pregnant by him; that he had repudiated his agreement and refused to marry her. This indictment was never brought to trial. Her allegation as to her condition was true. Late in October, 1910, she returned to Washington and on November 6, she had an interview with the defendant, at which time she charged him with the paternity of her child which was about to be born. Two days later the child was born at the Emergency Hospital in Washington, to which she had gone under an assumed name. On November 9, she was taken to the George Washington Hospital where she remained a little over three weeks. The defendant visited her there one or more times and, as she claims, sent her fruit and flowers. Subsequently they met at various times, their interviews being, according to her version friendly and even affectionate, but, as he claims, stormy. He paid her various sums of money aggregating about $900, prior to March, 1911, as he says, to buy his peace. In the early spring of 1911 he came to Bar Harbor. She followed him. They had an interview there, and soon after, he refused to pay her any more money or have anything further to do with her. She then instituted bastardy proceedings against him in Hancock county. The

case was tried at the April term, 1912. The fair inference from certain testimony in this case is that the defendant prevailed. She instituted this suit for breach of promise on October 16, 1913.

This is a mere skeleton of events taken chronologically. It is not intended as a statement of all the material facts on either side. But it is sufficient to enable us to resume the consideration of the vital issues before us in the light of the new evidence and that is its purpose.

The controlling issue is the existence of a mutual engagement of marriage. This admittedly can be proved either by direct evidence of an express promise or by evidence of such facts, conduct and circumstances as will lead to a reasonable inference of such engagement and contract. So far as the proof of an express promise on the defendant's part is concerned, the evidence comes wholly from the plaintiff herself, and its force rests therefore upon her credibility. It rests upon a weak foundation. In view of the fact that she is an admitted perjurer either in the courts of Iowa, where she instituted proceedings against Smith, or in the courts of Maine, where she makes the same charges against the defendant, little weight can be attached to her statements. She now states in her proceeding against Henderson that all her allegations in Iowa against Smith were false. Her testimony was perjured either there or here. "It must therefore be regarded as self evident that a woman such as the plaintiff describes herself to be with respect to the Iowa court proceedings, has little or no regard for the sanctity of an oath, and its binding obligation to tell the truth" said the court in the former opinion. The same criticism holds good now. The senseless excuse for her conduct that she offered at the former trial she repeats at this, and it neither palliates the offense nor lessens the enormity of her course of action.

The plaintiff's evidence on the point of an express contract remains uncorroborated. The only new witness introduced by her throughout the whole trial was her brother, John P. Garmong, and his testimony is meagre and unimportant. It relates to a brief interview that he had with the defendant at Bar Harbor in October, 1909, in relation to a boa which had been lost by the

plaintiff. During their conversation the brother says that the defendant spoke very highly of the plaintiff, told him that he had the highest respect for her and admired the ambitious spirit that had brought her east to pursue her studies. This was a colorless interview. No statement was made by the defendant even suggesting an engagement between the parties or in any way acknowledging the existence of such a relation. There was no hint of it. It bears no resemblance to the expected conversation between prospective brothers in law, and has no probative force in establishing the contract on which the plaintiff now relies. Apparently at the time it produced no effect on the brother. If it had, he would doubtless have communicated so important a fact to other members of his family. But they continued to remain in entire ignorance of any engagement between these parties until the denouement.

When we pass to the conduct of the parties, the circumstances and the probabilities of the case, no new light has been thrown upon the situation to warrant the inference of a subsisting agreement to marry. No engagement was publicly announced and there is no evidence that any friend or relative understood it to exist. Even as late as August 28, 1910, we find the plaintiff's sister writing to the mother of Dr. Smith and imploring her to persuade the doctor to keep his promise of marriage and save the plaintiff from being the mother of an illegitimate child. There was no engagement ring. There were no presents such as one would expect a person of the wealth of the defendant to shower upon his affianced wife. There was no public conduct from which an engagement could be inferred. There is no evidence that the alleged engagement was ever referred to by the defendant or by any third person in his presence. He returned to his luxurious club life in Washington, and she continued to earn her living by employment as a nurse.

The letters or notes that the defendant wrote to the plaintiff were not those of an affianced husband. They were infrequent in quantity and meaningless in quality, quite unlike the loving and even passionate letters that passed between the plaintiff and Dr. Smith to whom she evidently was engaged at the time she met the plaintiff and whose engagement continued for a considerable time

thereafter, if not until the legal proceedings were instituted by her in Iowa after she discovered that she was with child.

Upon this branch of the case, without discussing the evidence further it need only be said that the existence of a contract of marriage expressly made in Bar Harbor in August, 1909, or at Washington or elsewhere in February or March, 1910, or to be inferred from conduct and circumstances, is unsupported by such proof as commends itself to our judgment.

Thus far we have not referred to the evidence of the defendant. He strenuously denies any promise of marriage at any time. It is fair, however, to say that in his denial of the paternity of the child we think his testimony is not to be relied upon. The facts speak otherwise, and in that respect his credibility is certainly shaken. But in other respects and especially during the course of a long, searching and at times trying cross examination we find his testimony for the most part to be frank, truthful and consistent. The plaintiff on the other hand, perhaps because of the strain of a second trial, we find even less trustworthy than before. Her answers are evasive, at times reckless and again insolent to both counsel and court. We are constrained therefore by even stronger reasons than before to reject the plaintiff's claim of a promise of marriage either in August, 1909, or February or March, 1910, or at any time prior to November, 1910.

This brings us to the other main subject of controversy, the making or renewal of the defendant's promise of marriage in November, 1910, after the plaintiff's return from Iowa and on the eve of the birth of her child. Here we are forced to the same conclusion.

The law is well settled that if the plaintiff was unchaste with other men or with another man prior to or during any engagement of marriage with the defendant, it is a bar to this suit, unless at the time he made or renewed his promise, he knew or had been informed of her unchasity. *Garmong* v. *Henderson,* supra, p. 85.

Even assuming therefore that there had been a subsisting engagement, made either in August, 1909, or in February or March, 1910, her unchastity with Dr. Smith, either in previous years or during the spring and summer of 1910, would bar recovery

in this action unless the defendant was fully informed of all the material facts and, despite such knowledge, renewed his promise.

Her improper relations with Smith are abundantly proved. Smith testifies to those relations as beginning in May, 1907, and continuing until she left for the east. The correspondence that passed between them after she came east confirms his statement. Her letter to him dated June 20, 1908, was quoted and commented upon in the prior opinion. Its somewhat obscure or veiled language was interpreted to signify that sexual intimacy had existed between them. In it she seemed to claim the privilege of intimacy with other men if he had been untrue to her. Other letters introduced for the first time at this trial confirm the accuracy of that interpretation. Two days later, on June 22, 1908, she wrote: "Am really ashamed of asking what I did when I wrote Sunday, but if you have, I will too. Now be honest." Again in her letter of July 8, 1908, evidently referring a second time to her request of June 20, she says: "Well when I do use the limit of my nerve energy there will be no more letters from me. . . . Your refusal of my horrible request only deepened my love for you." Dr. Smith's letter to her in response to the "horrible request" was not produced. Words like these need no interpretation. They are self explanatory.

As to what took place between the plaintiff and Dr. Smith in the spring and summer of 1910, after her return from the east, the plaintiff has admitted by her sworn allegations in the Iowa proceedings. Smith's acts in endeavoring to settle the civil suit which incorporated seduction corroborate hers. It is not unlikely that because their illicit relations were resumed early in April, 1910, Smith considered himself responsible for her condition when she made her charges against him in July and September. The date of the birth of the child placed its conception in February rather than April and tended to shift its paternity from Smith to the defendant; but the fact of the sexual relations between Smith and the plaintiff during the spring and summer of 1910 remains unchanged.

The evidence upon the two essential points, first, whether the plaintiff gave Henderson full information as to her relations with

Smith and her accusation in Iowa, and, second, whether he promised to marry her despite this information, is no stronger for the plaintiff than it was at the first trial. All that this court said in the previous opinion upon both these points applies with equal force now. Repetition of the reasons is useless. Such a promise under all circumstances as disclosed is simply unbelievable. Her own conduct in at once instituting bastardy proceedings instead of a suit for breach of promise, negatives such a promise and reveals her own belief at the time.

Upon the question of the plaintiff's illicit relations with men other than Dr. Smith the new evidence introduced by the defendant bears strongly. If the testimony of apparently disinterested and reputable witnesses is to be believed, she began her improper conduct many years before she ever met the defendant, and according to her statements to those witnesses, her paramours had been many.

This brings us to what, after a long and careful study of the case, we believe to be the true situation and the real relations between the parties. The plaintiff claims that they were affianced husband and wife, the defendant that they were merely friends. The facts bear out neither hypothesis. The true solution seems to be what was suggested in the former opinion, the evidence of no bethrothal but of illicit relations between them from nearly the beginning of their acquaintance. With this theory the circumstances and probabilities harmonize. The defendant was a man thirty-nine years old, a widower, of present and prospective wealth, high social standing, culture and travel, a man of the world so called. The plaintiff was a woman of twenty-nine, of a different social sphere, away from her own home, with a somewhat varied experience, self supporting and worldly wise. The lively interest which they manifested in each other at the first casual introduction, the rapidity with which their acquaintance ripened, her following him to Bar Harbor without his knowledge when they had met but once before, the nature, times and places of their semi-clandestine meetings in Bar Harbor and subsequently in Philadelphia and Washington, the absence of those accompaniments which we would expect in the case of a true engagement, and which we have before

referred to, and the presence of other conditions which we should not expect, all point in one direction. They led in the end not to a legitimate marriage but to the birth of an illegitimate child, and the consequent proceedings under a bastardy complaint.

The result is deplorable, but this court cannot do otherwise than decide the precise issue now before it, which is the existence of a valid contract of marriage. That issue the plaintiff has failed to maintain and the entry must therefore be,

*Judgment for the defendant.*